SOUTHWICK, P.J.,
for the Court:
¶ 1. The Chancery Court of Madison County granted summary judgment authorizing foreclosure on a residential condominium owned by Herbert A. Kelso. We find insufficient evidence to prove that the charges made to Kelso were valid and free from usury. We reverse and remand.
FACTS
¶ 2. Herbert Kelso bought a condominium from The Breakers Association, Inc. in 1986. Among The Breakers’s powers is the authority to make assessments required for the general maintenance of the complex. On March 9,1992, The Breakers Board of Governors adopted a 20% per month late charge (240% per annum) on delinquent assessments. Litigation brought by another condominium owner resulted in the 20% rate being declared usurious. Rea v. Breakers Assoc., Inc., 674 So.2d 496 (Miss.1996). The court’s explanation of the facts of the usury was this:
The bylaws authorize the board to fix a penalty or “late charge” on delinquent payments. The board of governors of the Association adopted a 20% late fee *1017 to be charged on unit owners’ delinquent monthly charges. If a unit owner fails to pay a monthly carrying charge, and the default continues for an entire year, the unpaid monthly carrying charge will be assessed each month with a 20% late fee, resulting in annual total late fees equaling 240% of the amount due.
Unpaid late charges from a preceding month are added to the principal balance due the next month, to which the 20% per month late charge is applied. By charging 240% per annum on each monthly payment, and by charging late fees on unpaid late fees, the Association accrues a balance due from the unit owner that grows exponentially.
Id. at 497.
¶ 3. After several years of attempting to collect from Kelso and after one previous failed attempt to foreclose, The Breakers again filed a notice of assessment on April 9, 1997. A complaint was filed in Madison County Chancery Court on June 20, 1997, seeking to foreclose if the assessment was not paid. Kelso filed a partial answer on September 5,1997. The Breakers filed for summary judgment on December 10, 1997. No response was filed before the first hearing on December 22, 1997. The chancellor, concerned that Kelso did not have legal counsel, postponed the hearing. Kel-so had still not retained legal counsel by the time of the second hearing, though he had written the chancellor in an attempt to explain why and request more time. Kel-so also had not filed any affidavits or other sworn evidence with the court. His response was limited to a long, unsworn letter to the chancellor explaining his travails. After a hearing on January 15, 1998, the chancellor granted summary judgment and found The Breakers entitled to $14,927.66 which includes attorneys’ fees.
DISCUSSION
¶ 4. The learned and conscientious chancellor was faced with a difficult task: sorting through a dispute in which considerable animosity had developed and in which one party was not represented by an attorney. Compounding the problem was that the central issue was a monetary assessment and only one party was providing assistance in determining whether the calculation was correct. The context for the assessment was that the plaintiff association had recently been found by the state supreme court to have grossly overreached in its charges to another homeowner. The question at some part of the analysis was whether the charges that the supreme court had found to be usurious had been completely erased from Kelso’s ledger. As the record reveals, the charge initially against this homeowner had reached more than $53,000 in September 1996. Once the supreme court ruled that most of the charges were usurious, the association’s claim dropped back to about $7,000.
¶ 5. When one litigant fails to obtain an attorney, the chancellor, with whatever flexibility in court procedures are granted in his discretion, ultimately has to apply the rules that underlie our adversary process and resolve the dispute. The chancellor cannot become the pro se litigant’s advocate. This was a motion for summary judgment. The motion provided a forum for the plaintiff to prove the validity of the charge and the defendant to indicate whether any dispute of material fact existed. We examine what was presented in order to determine if entitlement to the claimed sum was proven without material factual dispute.
¶ 6. The Breakers’s motion for summary judgment presented three pieces of supporting evidence. First was a notice of assessment that was earlier filed by The Breakers, perfecting a lien in the amount of $10,546.07. Second was a sworn affidavit by The Breakers’s accountant attesting to the claim that the charges against Kelso had “been calculated in accordance with” the supreme court’s decision in Rea, and that the charges were proper. The third piece of evidence was a printout of a ledg *1018 er sheet of Kelso’s debits and credits from January 4, 1991, until December 2, 1997.
¶ 7. The first item, the 1997 notice of assessment, was in compliance with the condominium statutes for creating a lien securing unpaid assessments. Miss.Code Ann. § 89-9-21 (Rev.1991). That statute provides that suit may be brought under the provisions for power of sale, foreclosure of deeds of trust. Miss.Code Ann. § 89-1-55 (Rev.1991). The notice of assessment itself, however, is not conclusive proof of the validity of the assessments, but merely a mechanism for perfecting a lien and a precursor to proceeding with a sale of the property.
¶ 8. The second element of proof was an affidavit from The Breakers accountant attesting to the lien’s correct amount and that the financial figure was arrived at in compliance with Rea.
5. Herbert A. Kelso, as of December 2, 1997, was indebted to The Breakers Association, Inc. in the amount of $7,552.82 for unpaid assessments, interest, and late charges.
6. The penalties (late charges) and interest included in the above balance on Herbert A. Kelso’s Account have been calculated in accordance with Mississippi law as defined in Rea v. The Breakers Association, Inc., 674 So.2d 496 (Miss.1996), which is attached as Exhibit B. I am familiar with the requirements of the Rea decision and certify that Herbert A. Kelso was assessed late charges and interest in complete accord with ... the guidelines of that decision.
This statement becomes the central focus for whether summary judgment was properly granted. As already indicated, the starting proposition is that for years The Breakers was vastly over-penalizing its delinquent homeowners. The documents filed for summary judgment indicated that this over-billing had been applied to Kelso, but the records alleged that the full effect of the supreme court’s Rea decision had been taken into account and Kelso really did owe the new amount.
¶ 9. The effect of the bare statement is controlled by procedural rules. The old evidentiary statute permitting judgment on a sworn account unless the defendant filed a counter-affidavit has been repealed. Miss.Code Ann. § 13 — 1— 141 (1972), repealed 1991 Miss. Laws ch. 573, § 141. It is still necessary by procedural rule to attach a copy of the account to the complaint. M.R.C.P. 10(d). The change in approach removes the evidentia-ry effect, the irrebuttable presumption of accuracy, of a sworn account to which no counter-affidavit is submitted. Key Constructors v. H & M Gas Co., 537 So.2d 1318, 1322 (Miss.1989). Instead we have a mixed legal-accounting issue, in which the effect of a supreme court decision needed to be applied to a running balance stretching back several years, offending charges removed, and a new balance derived. The court had to determine if there was enough evidence before him to prove that The Breakers was “entitled to a judgment as a matter of law” for the amount sought. M.R.C.P. 56(c).
¶ 10. Attached to the conclusory statement of the accountant was the third piece of evidence,’a five-page document entitled “Kelso-Original Billing.” This contained entries on a computer-generated ledger beginning in January 1991 and continuing until December 1997. There were multiple entries each month, indicating the assessment, an insurance charge that was annual, a lease charge, late charges, a place to reveal the payment, and a running balance. This ledger revealed that the association considered Kelso delinquent for all but one month over the entire period, that one $3,000 payment was made in 1992 that gave him a slight credit, but otherwise the amount grew dramatically. Beginning in June 1994, Kelso made a monthly $198.48 payment that was about $50 more than the monthly assessment. The unpaid balance continued to grow as he was apparently being assessed a late charge each month for not having eliminated the balance.
*1019 ¶ 11. On April 4,1996, the supreme court declared that the extraordinary penalties being charged by The Breakers to homeowners who made late payments were usurious. Rea, 674 So.2d at 500. As the opinion discussed, The Breakers was charging a new penalty for each month that a balance was carried forward even if no new delinquency occurred. Here, Kel-so beginning in mid-1994 was paying his monthly assessments but was getting charged a new penalty each month because of the balance on his account. There is no evidence in this case of the means by which the late charge was calculated. The late charge that in Rea was said to be 20% of the balance does not seem that high here. For example, on July 31, 1994, the balance owed was shown as $20,122, and on August 2, 1994, a late charge was assessed of $1,060. If that is taken as a percentage of the entire balance, that is just over 5% in one month. Regardless of the means of calculation, every month the balance was growing in 1994 by over $1,000; in 1995 by over $1,400; and in 1996 by over $1,600.
¶ 12. When the supreme court found usury, they also found that the rate was so exorbitant that not only was the interest forfeited but on remand a determination would need to be made on whether the principal also was forfeited. Rea, 674 So.2d at 500. Two statutes work together to require that result. A late charge is declared to be a finance charge if it is more than the permitted amount, which is $5.00 or 4% of the amount of the delinquent payment. Miss.Code Ann. § 75-17-27 (Rev.1991). The charge cannot be collected more than once on a specific installment. Id. If the finance charges, including charges given a different name but which by state statute are declared to be finance charges, are more than twice the maximum rate, “the principal and all finance charges shall be forfeited and any amount paid may be recovered by suit.” Miss.Code Ann. § 75-17-25 (Supp.1998).
¶ 13. Therefore, what an accountant would have had to do to the charges against Kelso after Rea was calculate how much of the late payment charge was actually a finance charge. Then a determination would need to be made as to the proper maximum rate that could be charged by law under section 75-17-1 or other applicable statute. Some evidence would then be required to show whether the finance charge was ever twice the maximum authorized by law. If so, the entire amount that was subject to that finance charge would be forfeited. This raises the possibility that if The Breakers was charging a percentage of the entire balance each month as a late charge, and of course only one 4% penalty could ever be charged per delinquent payment, then it was a finance charge that if sufficiently greater than the maximum rate of interest would have caused the entire balance on which the late payment charge was calculated to be forfeited. Rea does not address what the maximum rate of interest might be, but suggests that it is the rate applicable to the unpaid balance properly owed by the home-owner. Since the balance here was overflowing with previous improper late payment charges, the effective rate of interest on the proper balance was greatly inflated. The payments that Kelso made might also have to be refunded.
¶ 14. We are left completely unaware as to the means by which the accountant derived a $7,000 balance after Rea allegedly was taken fully into account and a $46,000 credit given to Kelso. That credit merely appears as an entry for October 1, 1996. There is nothing attached to the affidavit revealing how those Rea requirements were applied. Compliance is simply presented as a fact, yet this issue goes to the very heart of the dispute in this case. The chancellor admitted he was not sure how the numbers were derived, but that they appeared to be less than what could have been charged. He asked one of The Breakers’s attorneys to explain. “Well Bob Robinson, [The Breakers’s] accountant did that. And, we met with him. *1020 This thing is so convoluted, I couldn’t give you a real credible explanation on that.” This is the equivalent of an unitemized account, in that a large component of the account is unexplained but is just given as a gross figure. Ricks Lumber Co., Inc. v. Natchez Steel & Pipe, Inc., 318 So.2d 883, 888 (Miss.1975 ) (“unless the account is properly itemized, plaintiff is not relieved of the burden of proving the correctness” even under former practice).
¶ 15. It is necessary for “significant, probative evidence” to be presented on motion by the party who would have the evidentiary burden at trial. Skelton v. Twin County Rural Electric Assoc., 611 So.2d 931, 935 (Miss.1992). Here an accountant in effect stated “I understand what the Rea court meant and I have determined that $46,000 should be deducted.” The probative sufficiency of that evidence can be compared to what has been held sufficient on summary judgment:
We hold that in an open account or collection suit where the creditor has filed a motion for summary judgment, an undisputed affidavit from the creditor’s manager that the account is due and is unpaid where accompanied by the account or ledger sheet which is obviously a business record, entitles the creditor to summary judgment. The affidavit of William Edward Scott establishes the amount of the debt, that it is unpaid, and that it is now due and payable — in fact, payment is well overdue. The attached account ledger adds great credibility to Credit Center’s claim. In view of Brown’s feeble denials, we hold the Scott affidavit and attached ledger adequate to undergird a valid summary judgment.
Brown v. Credit Center, Inc., 444 So.2d 358, 364 (Miss.1983). Our case is much different. Judgment was sought based on an admittedly inaccurate business record for the period before October 1996, and the corrections were explained only with a conclusory statement that the overcharge — over 85% of the previous balance — had been deducted. Had The Breakers zeroed out Kelso’s account after Re a, these questions would not need answering. That did not occur. Rather, The Breakers recalculated his debt at what they proclaim is a Rea compliant rate. That may be, but the proof was not presented on summary judgment. There was no means for the fact-finder to review whether that which was done was done correctly.
¶ 16. We point out that if “doubt exists whether there is a fact issue, the nonmoving party gets its benefit.” Brown, 444 So.2d at 362. We have considerable doubt here. The difficulty here is not the strength of Kelso’s evidence but the weakness in that presented by the Breakers. The moving party did not submit probative evidence that they were entitled to summary judgment for the amount sought. In fact, the factual questions are so profound that it is conceivable that Kelso was entitled to a refund. As stated in Rea, he might even be entitled to his own attorney’s fees except that he was unrepresented. Rea, 674 So.2d at 501. Based on the absence of evidence, we find that after all the affidavits and proper evidence were considered, there was nothing on which to resolve the case.
¶ 17. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS REVERSED AND THE CASE REMANDED FOR FURTHER PROCEEDINGS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.